# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JODY BACON,

    *Petitioner*,                                        3:09-cv-00245-LRH-WGC

vs.

                                          ORDER

JACK PALMER, *et al.*,

    *Respondents.*

This habeas matter under 28 U.S.C. § 2254 comes before the Court for decision on the merits.

### *Background*

Petitioner Jody Bacon challenges his 2004 Nevada state conviction, pursuant to a jury verdict, of three counts of sexual assault of a minor under the age of fourteen, four counts of lewdness with a child under the age of fourteen, two counts of lewdness with a child under the age of fourteen with the use of a deadly weapon, and one count of first-degree kidnapping.

Petitioner presents multiple claims of alleged ineffective assistance of trial counsel.   As backdrop to these claims, the evidence at trial tended to establish the following.[1]

    */ / / /*

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material.  No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court.  Any absence of mention of specific evidence does not signify that the Court has overlooked the evidence in considering petitioner's claims.  The Court refers to what the evidence at trial tended to establish because petitioner must show, *inter alia*, that there was a reasonable probability that, but for trial counsel's alleged deficient performance, the result of the trial would have been different.

1      Officer Larry Cripe testified as follows.  At around midnight on March 1, 2003, he was on

2  patrol in a marked police cruiser.  He testified that he saw a vehicle parked in a travel lane in a

3  construction zone.  Officer Cripe elaborated that there were traffic cones running across the street and

4  marking a travel lane.  The vehicle was blocking the marked travel lane.  According to his testimony,

5  the vehicle was not parked in a legal parking space.[2]

6      The officer further observed that the vehicle's lights were off and that the windows were fogged

7  up.[3]

8      Officer Cripe drove down to the next crossing street, observed the vehicle for a second,

9  determined his exact location in the remote area, and radioed it in to the dispatcher.  He then started to

10  make a U-turn to go back and make a traffic stop.  As he began to make the U-turn, the vehicle started

11  to leave.  The officer turned on his lights and siren, and the vehicle yielded and pulled over.[4]

12      Officer Cripe approached the vehicle on foot to make contact with the driver.  Jody Bacon was

13  in the driver's seat, and the officer obtained Bacon's driver's license and insurance.  Bacon seemed

14  nervous; his hands were shaking; and he was "real sweaty."[5]

15      Officer Cripe saw that the passenger was "a pretty small female with a large overcoat on" and

16  "[i]t didn't appear she had any shorts or pants on."  He asked Bacon who the passenger was.  Bacon

17  gave him a name, and he volunteered that she was 18.  Officer Cripe looked down at the passenger's

18  face, and he testified that "[s]he looked to be 13 or so, to me."  Her pants were off and were laying in

19  between the driver and passenger seats.  The officer had the female step out of the car.  He observed that

20  she had to put her pants on before she got out of the vehicle.  He brought her back to his patrol car.[6]

21      */ / / /*

22

---

23      [2]#18, Ex. 2f, at 211-15.  The Court reiterates that it is summarizing the witnesses' testimony in the text, not stating findings of fact by this Court.  Bacon maintained in proper person at trial during colloquies outside the presence

24  of the jury that the officer lied to establish probable cause, as is discussed, *infra*, regarding his third and sixth claims.

25      [3]#18, Ex. 2f, at 215-16.

26      [4]#18, Ex. 2f, at 216-17 & 226-28.

27      [5]#18, Ex. 2f, at 217 & 225-26.

28      [6]#18, Ex. 2f, at 217-19; *id.*, Ex. 2m, at 25-27.

1    At the patrol car, the officer asked the female passenger her name, and she told him that she was

2    A.P., which was different than the name that Bacon had given.  Officer Cripe testified that when he

3    asked her date of birth, "she asked me if she could be honest with me."  After he told her that it would

4    help with his investigation, she gave him her date of birth, told him that she was twelve, and said that

5    it was her father in the car.  When Officer Cripe asked her what had been going on in the vehicle, she

6    told him that her father had rubbed her crotch area with his fingers and then also had used his tongue

7    in the same area.[7]

8    A.P. had wrapped herself tightly in the overcoat on the cold night when she exited the vehicle.

9    Officer Cripe saw thereafter that she did not have a shirt on under the coat and was wearing only a bra.[8]

10    Officer Cripe called for backup.  As he was doing so, he saw that the brake lights on the vehicle

11    were on and the engine was running again.  The officer had instructed Bacon during the initial contact

12    to turn the vehicle off, which he had done at that time.  Now, however, the vehicle was running again.[9]

13    Officer Cripe left A.P. in the patrol vehicle and went over to the subject vehicle and confronted

14    Bacon.  He told Bacon to turn off the vehicle, which he did.  Bacon did not look at the officer, however;

15    and he kept looking forward with a blank stare.  Officer Cripe then told Bacon to take the keys out of

16    the ignition and give them to him.  Bacon asked him why, and Officer Cripe again told him to take the

17    keys out of the ignition and give them to him.  Bacon "took the keys out, held them in his hand, took

18    a deep breath, put the keys back in the ignition, started the car, and took off."[10]

19    Officer Cripe returned to his patrol car and gave pursuit, with A.P. still in the patrol car.[11]  The

20    pursuit "got up to 60 or 70 miles an hour, roughly."  Bacon drove his vehicle through a fence into a

21    riding area, then out of the riding area onto a dirt road, and finally into a dirt field.  When both vehicles

22

23    [7]#18, Ex. 2f, at 218-19.

24    [8]#18, Ex. 2f, at 219.

25    [9]#18, Ex. 2f, at 219-20.

26    [10]#18, Ex. 2f, at 220.

27    [11]The officer acknowledged at trial that it perhaps had not been a good idea to engage in a high-speed pursuit
28    with the twelve-year-old in the patrol car.  #18, Ex. 2f, at 223-34.

became stuck, Bacon exited his vehicle and started running.  Officer Cripe chased Bacon on foot and subdued him.[12]

The man that Officer Cripe apprehended was a man in his early 40's who was approximately 6'3" tall and weighed approximately 245 pounds.  After apprehending Bacon, Officer Cripe turned further investigation over to Detective Marvel Courtney, who worked on the sexual assault detail.[13]

A T-shirt and tank top were recovered from the passenger side of Bacon's vehicle and booked into evidence.[14]

Detective Courtney informed Bacon of the charge for which he was being arrested and gave him an opportunity to tell him what happened.  Bacon declined to give a statement.  The detective testified, however, that Bacon thereafter initiated discussion during the ride to the detention center.  *Inter alia*, Bacon talked about Las Vegas, and he asked the detective how long he had lived in the area.  Bacon asked the detective whether he ever had done "speed," *i.e.,* methamphetamine.  Bacon then said that speed had messed up his life and that he had stayed off of speed for a while before recently moving back to Las Vegas.  He said that he had used speed that day, stating: "And then I do something like this."[15]

A sexual assault examination of A.P. was conducted by a pediatric emergency room physician and nurse a short time after the apprehension of Bacon.[16]

The sexual assault examination results and further forensic examination and testing reflected the presence of saliva in A.P.'s vagina.  The forensic serologist who conducted specialized testing for the presence of saliva testified that the sample recovered was "definitively saliva" as opposed to other bodily fluids or secretions.[17]

/ / / /

---

[12]#18, Ex. 2f, at 221-22.  Both vehicles were damaged in the pursuit.  *Id.*, at 222-25.

[13]#18, Ex. 2f, at 226 (Cripe) & 232-35 (Courtney); *id.*, Ex. 2m, at 24-25 (Cripe).

[14]#18, Ex. 2f, at 236-44.

[15]#18, Ex. 2f, at 244-46, 257-58 & 259; *id.*, Ex. 2g, at 257-59.

[16]#18, Ex. 2n, at 82-96.

[17]#18, Ex. 2n, at 69-81, with the ultimate central conclusion at 79.

-4-

1    DNA analysis established the presence of DNA from two individuals in the sample recovered
2    during the sexual assault examination. The DNA came from A.P. and only one other individual, a male,
3    in nearly equal proportions. Such mixed DNA material could not be completely separated into two
4    discrete and separate results. A number of "genetic addresses" or "STRs" (*i.e.*, short tandem repeat
5    regions), matched genetic material in STRs from A.P.'s DNA, although they also may have been shared
6    with the male because the genetic material was present in large or "predominant" quantities. Bacon also
7    shared STRs with those same genetic characteristics. Four of the other markers or STRs, however,
8    contained genetic characteristics that were from the male's DNA alone. When these STRs were
9    compared to Bacon's DNA, they did not rule out Bacon as the source of the DNA recovered during the
10   examination because his DNA included all four STRs with the same genetic characteristics. When the
11   forensic criminalist compared the STRs that came exclusively from the male in the sample with the
12   general population, approximately 1 in 270,000 Caucasian males in the United States would be expected
13   to have the same four STRs with those characteristics.[18]

14       The forensic criminalist testified that it was unusual to recover the amount of material with male
15   DNA – confirmed by the serologist to be saliva – recovered in the present case in a case where
16   cunnilingus but not penile penetration was alleged to have occurred. He attributed the ability to recover
17   so much material with male DNA in the present case to how quickly the sexual assault examination
18   occurred after the alleged incident.[19]

19       During the sexual assault examination, the pediatric emergency room physician did not observe
20   any signs of trauma or injury in her overall "head-to-toe" examination. She further did not observe any
21   trauma, injury, or redness on a colposcopic vaginal exam. She testified that instances of sexual abuse
22   of a child that involved only fondling generally would not leave redness or injury. There was no
23   evidence of penetration. The physician testified that evidence of penetration would not be present
24   where only oral sex had occurred. Nor was there any other evidence of sexual activity from the physical

25

26

27   [18]#18, Exhs. 2m & 2n, at 28-68, with particular reference to 45-49, 52-62 & 65-67. Bacon then was married to A.P.'s mother, but he was not A.P.'s biological father. See #18, Ex. 2o, at 101-02.

28   [19]#18, Ex. 2m at 47-49.

1  examination, with A.P. presenting with a completely normal vaginal exam.  The physician testified that
2  this also was not unusual in cases of sexual abuse of children.  She referred to a study involving teenage
3  girls who were pregnant at the time of the examination where there were no objective findings reflecting
4  penetration in 95 percent of the pregnant girls.[20]

5          A.P.'s mother, Mary Bacon, testified as follows.

6          When she met Jody Bacon, she had a four-year-old son, and her daughter A.P. was eighteen
7  months old.  She and Bacon married thereafter; and they had another child together, a daughter.  The
8  younger daughter was approximately five years younger than A.P.[21]

9          According to Mary Bacon, when A.P. became older, Jody Bacon started to treat the two
10  daughters differently.  He would take A.P. out shopping without the other daughter.[22]  He would buy
11  expensive things for A.P. without also getting something equivalent for the other daughter, which hurt
12  the younger daughter's feelings.  Jody Bacon bought things for A.P. that Mary Bacon did not regard as
13  appropriate for her age, including halter tops, swim suits and shorts.  He had her hair frosted, like her
14  mother, when she was ten or eleven.  He let her get her belly button pierced when she was twelve.  Jody
15  Bacon sometimes called A.P. by the nickname "Little Mary," referring to her as "the Mary that didn't
16  bitch."  Mary Bacon had not suspected at that time that anything improper had been occurring.[23]

17          Prior to the March 2003 incident, Mary Bacon and Jody Bacon had separated; and a divorce was
18  being sought.  They were in an ongoing child custody dispute; and Jody Bacon had been given visitation
19  rights by the court, which upset Mary Bacon.  She wanted full custody of the children.[24]

20

21          ───────────────────

22          [20]#18, Ex. 2n, at 90-96.

23          [21]#18, Ex. 2o, at 101-03.

24          [22]Mary Bacon acknowledged on cross-examination that she had stated to an investigating detective that Jody
   Bacon always took A.P. and her sister together.  She testified that this was incorrect.  According to her testimony, Jody
25  Bacon would take both daughters with him when he was taking them pursuant to court-ordered visitation.  However, she
   was steadfast in her trial testimony that there were times when he took A.P. alone without the other daughter. #18, Ex.
26  2o, at 113-14, 122-24 & 126-27.

27          [23]#18, Ex. 2o, at 103-05, 114-17 & 124-25.

28          [24]#18, Ex. 2o, at 103-05, 117-18 & 120-21; *id.*, Ex. 2p, at 188-90.

                                         -6-

1      On March 1, 2003, they all were gathered for a barbecue at a friend's home that the children

2  wanted to go to.  Afterwards, Mary Bacon left with her son; and A.P. and the other daughter left with

3  Jody Bacon.  Thereafter, at about 1:00 a.m., Mary Bacon was called to go to the hospital where the

4  sexual assault examination was being performed, to be with A.P.[25]

5      According to her testimony, Mary Bacon had not been aware of any alleged sexual abuse of A.P.

6  before she was called to the hospital.  She testified that A.P. told her about other incidents later, and

7  only in incomplete accounts given over a period of time rather than all at one time.  Mary Bacon denied

8  having coached A.P.'s testimony.[26]

9      Mary Bacon further testified that she later received a letter written in what she testified was

10  Jody Bacon's handwriting.  The state court had ordered Jody Bacon to provide a handwriting exemplar

11  for comparison, but he refused to do so.  The court ordered that the jury be informed of that refusal at

12  trial.[27]  The following stipulation accordingly was read to the jury:

> [T]hat the defendant was ordered to provide a handwriting exemplar to be compared to the letter, that the defendant refused said exemplar, and that therefore no further testing could be done on the letter to prove that that was, in fact, his handwriting.

16  #18, Ex. 2p, at 201.

17      The letter read:

> Dear Mary, Kids.  I am not sure where to start.  So I am going to start by saying I'm sorry.  I am so very sorry.  Please forgive me.
>
> I know I may be – it may be too soon to ask you, and that's fine.  I told you once, if it wasn't for you and the kids, I would be dead or in prison.  I guess this is where I belong.  I am going to be here a long time, the rest of my miserable life.
>
> They don't treat sex offenders very well.  I'm looking at – I'm looking at 20 years to life.  That's okay.  I have that coming.  I hope to get a letter from you-all soon.  If not, that's okay, too.
>
> I love you all,

---

[25]#18, Ex. 2o, at 105-06.

[26]#18, Ex. 2o, at 106, 117-20, 122, 125-26, & 128-29.

[27]#18, Ex. 2o, at 107-10; *id.*, Ex. 2p, at 181-82.

Joe or Dad

P.S.  If my income tax check comes, and you can't cash it, send it here.  And when I - when it goes into my account, I will release all of it to you.  I don't need it where I'm going.

Joe

#18, Ex. 2o, at 111-12.

A.P. was fourteen when she testified at trial.  Counsel had to slow A.P. down in her testimony a number of times.  She acknowledged over the course of her testimony that she was nervous and embarrassed and that she was talking fast hoping to get off the stand.[28]

A.P. corroborated Mary Bacon's testimony that Jody Bacon treated her differently than her sister and would take her places without her sister.  She testified that he sometimes called her Little Mary and said that she reminded him of her mother.  As Mary Bacon had testified, A.P. testified that Jody Bacon would refer to her as "the Mary that didn't bitch."[29]

A.P. testified regarding four separate incidents.

According to her testimony, she was eleven years old at the time of the first incident.  A.P. and her sister were staying overnight with Jody Bacon at the home of some friends that he was living with at that time.  Bacon wanted them to go to bed early for some reason that they did not understand.  The girls were on the floor in or on sleeping bags, with A.P. laying on her sleeping bag and wearing a night gown.  Her sister fell asleep.[30]

A.P. testified that, after her sister had fallen asleep, Bacon got up and went to the door.  Bacon said that he was going to find her mother, and he said something about killing her.  A.P. told him to not do that because she did not want her mother to die.  Bacon then came back from the door, and he asked A.P. whether she could be his little girl.  A.P. thought that he meant like his daughter, and she said yes.  Bacon then got on the floor and started touching A.P.  She asked him what he was doing, and he said

---

[28]#18, Ex. 2o, at 131-33, 139, 144, 154 & 161.  The defense had reserved the right to recall A.P.'s mother, so she was not in the courtroom.  A.P.'s older brother and a victim witness advocate were present in the courtroom during her testimony.  The courtroom otherwise had been cleared of the public and nonessential personnel.  *Id.*, at 130-31.

[29]#18, Ex. 2o, at 133-35.

[30]#18, Ex. 2o, at 135-36 & 143-45; *id.*, Ex. 2p, at 161.

-8-

1    that she said that she was going to be his girl.  She said that she did not mean it that way and thought
2    that he meant like his daughter.[31]

3         A.P. testified that Bacon continued to touch her.  He touched her vagina ("my private") and her
4    breasts, and he engaged in oral sex with his mouth on her vagina.[32]

5         According to A.P.'s testimony, the second incident occurred at the same place on another night
6    when she and her sister were staying overnight with Bacon.  They were on the bed watching television,
7    and both girls fell asleep.  A.P. then awoke to find her underwear ripped or cut and down by her ankles.
8    Bacon had a pocketknife, and it appeared that he had cut the side out of her underwear.[33]

9         Bacon held the knife to A.P.'s side, by her right hip; and he started touching her.  She started
10   crying and told him a number of times that she did not want to be touched.  Bacon did not stop.  He
11   touched her vagina and her breasts.[34]

12        A.P. testified that the third incident happened at her house in her brother's room.  She had just
13   got out of the pool and was in her swimsuit.  Her sister was downstairs watching television, and her
14   mother was at work.[35]

15        Bacon shut and locked the door.  A.P. "wanted to get out and go downstairs with my sister,
16   because I knew that if he did that, that it was going to happen again" and she "didn't want it to."  Bacon
17   told her to take off her swimsuit, telling her that if she did not "that he was going to kill my mom and
18   my sister."  She did not take off her suit, and Bacon took it off.  He touched her with his hands and
19   mouth, touching her on her vagina with his hand and mouth and on her breasts with his hand.[36]

20        A.P. testified that the fourth incident was the time with the police officer, referring to the March
21   2003 incident leading to Bacon's arrest.  After the barbecue that day, he told her that he would take her

22   _____

23        [31]#18, Ex. 2o, at 145-46.

24        [32]#18, Ex. 2o, at 146-48.

25        [33]#18, Ex. 2o, at 135-40.

26        [34]#18, Ex. 2o, at 141-43.

27        [35]#18, Ex. 2o, at 148.

28        [36]#18, Ex. 2o, at 148-49.

1  to get her nails done.  He told her on the way, however, that she would have to sleep in his room with

2  him.  She told him that she wanted to get her clothes and go to her home instead.  He said no, and they

3  argued as they drove around.  A.P. told Bacon a number of times that she wanted to go home.  She

4  testified that she did so because "I didn't want him to touch me again."[37]

5      A.P. testified that Bacon then told her that he would teach her to drive.  They were in a remote

6  area, and he let her drive the car for a few minutes. He then took over the driving again.  A.P. testified

7  that "then he kept on making all these turns where I didn't know where we were at . . . [s]o I didn't

8  know where I was to go home because I was kind of in the middle of nowhere."[38]

9      According to A.P.'s testimony, Bacon told her to take off her clothes; and she said no.  He said

10 that if she did not take off her clothes he would keep driving off into the mountains and she would never

11 see her mother again.  She started crying and asked him to take her home.  A.P. testified that she did

12 so "over and over and over, and he just kept saying no."  After he told her that she would never see her

13 mother, brother, or sister again, she took off her clothes down to her underwear and bra.[39]

14     Bacon pulled over and removed A.P.'s underwear.  He then touched her vagina with his hand

15 and mouth, and he touched her breasts with his hand.[40]

16     After cars kept passing, however, Bacon stopped touching her; and he started to drive around

17 the corner.  He then was stopped by the police officer.  A.P.'s testimony as to what transpired after that

18 point substantially accords with Officer Cripe's testimony.[41]

19     A.P. testified that she thereafter told her mother and investigators about all of the incidents only

20 over time.  She did not tell everything immediately because Bacon previously had told her that if she

21

22    [37]#18, Exhs. 2o & 2p, at 148 (lines 6-9) & 150-53.

23    [38]#18, Ex. 2p, at 153-54.

24    [39]#18, Ex. 2p, at 154-55.

25    [40]#18, Ex. 2p, at 155-56.

26
27    [41]#18, Ex. 2p, at 156-59 & 164.  A.P. testified, *inter alia*, that Bacon told her to say that she was 18; that she was wearing only her underwear, bra, and a jacket when they were stopped; that she had to put on her pants before she got out of the car; that she became confused when talking to the officer and gave him her real birth date; and that she
28 told him at least part of what had happened in the car, with it being difficult for her to discuss the topic with the officer.

1  did he would kill her mother and sister, and she also was not sure as to her own safety if she did.  It also

2  was difficult for her to discuss the incidents, and she blamed herself for the incidents at her house.[42]

3       A.P. testified that the four separate incidents happened between January 1, 2001, and March 2,

4  2003.  The State did not ask her at trial otherwise to specify approximate dates for the four incidents.

5  She was 11 at the time of the first incident, and she was 12 at the time of the last incident in March

6  2003.  She testified that at trial she was three inches taller and "more grown up" than she had been.[43]

7       A.P. acknowledged on cross-examination that she had testified under oath in the past in the case

8  and that it was true that her story had changed over time.[44]

9       A.P. was not able to identify Bacon in the courtroom at trial as he appeared at that time.  She

10  said that "I haven't even [seen] him in awhile."  She identified him, however, from a photograph that

11  reflected how he looked in March 2003.  She also testified on redirect that she had identified him in

12  person at the preliminary hearing.[45]

13       Mary Bacon was recalled by the State after A.P.'s testimony.  She identified Jody Bacon sitting

14  at the counsel table at trial.  She testified that Bacon did not look the same as he had previously and did

15  not look the way that he looked when A.P. knew him.  At trial, he no longer had the mustache, goatee,

16  and long hair that he had when A.P. knew him; and he was wearing glasses.  He further was wearing

17  a white button-down shirt at trial whereas A.P. testified that when she knew him he dressed like

18  "Harley-Davidson . . . motorcycle people do . . . with the leather boots and blue jeans."[46]

---

[42]#18, Ex. 2p, at 159-60.

[43]#18, Ex. 2p, at 160-61 & 163-64.

[44]#18, Ex. 2p, at 170-71.

[45]#18, Ex. 2f, at 213-14 (description and admission of photograph); *id.*, Ex. 2p, at 166-68 & 171-72 (A.P. trial testimony).

    When the prosecutor previously had referred to Bacon as A.P.'s "dad" earlier in her testimony, she asked: "Can you please not call him Dad?" and "Can you please not call him my dad?"  She answered "no" when asked whether she had another dad. #18, Ex. 2p, at 164.  According to Mary Bacon's testimony, A.P. had been eighteen months old when Mary Bacon met Jody Bacon.

[46]#18, Ex. 2p, at 167-68 (A.P.) & 188-89 (Mary Bacon).

-11-

1     Mary Bacon also testified that at the time of the sexual assault examination – which would have
2     been in the same general time frame during which A.P. also would have been talking initially to
3     investigators – "[s]he kept crying, asking me not to let them touch her, to just please take her home."
4     She testified: "That's all she wanted was to go home."[47]
5          Neither the State nor defense thereafter presented further testimony at the trial.

6                                         ***Governing Law***

7          The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential"
8     standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court
9     decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under
10    this highly deferential standard of review, a federal court may not grant habeas relief merely because
11    it might conclude that the state court decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28
12    U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to
13    or involved an unreasonable application of clearly established law as determined by the United States
14    Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence
15    presented at the state court proceeding.  131 S.Ct. at 1398-1401.

16         A state court decision is "contrary to" law clearly established by the Supreme Court only if it
17    applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision
18    confronts a set of facts that are materially indistinguishable from a Supreme Court decision and
19    nevertheless arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).  A state
20    court decision is not contrary to established federal law merely because it does not cite the Supreme
21    Court's opinions.  *Id*.  Indeed, the Supreme Court has held that a state court need not even be aware of
22    its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id*.
23    Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its
24    own, when the precedent from [the Supreme] Court is, at best, ambiguous," 540 U.S. at 16, because
25    a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not
26    contrary to clearly established federal law.

27

28         [47]#18, Ex. 2p, at 190.

-12-

1    A state court decision constitutes an "unreasonable application" of clearly established federal

2 law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts

3 of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis*

4 *v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

5    To the extent that the state courts' factual findings are challenged, the "unreasonable

6 determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v.*

7 *Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be

8 particularly deferential" to state court factual determinations. *Id.* The governing standard is not

9 satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.

10 Rather, AEDPA requires substantially more deference:

11          . . . . [I]n concluding that a state-court finding is unsupported by
           substantial evidence in the state-court record, it is not enough that we
12         would reverse in similar circumstances if this were an appeal from a
           district court decision. Rather, we must be convinced that an appellate
13         panel, applying the normal standards of appellate review, could not
           reasonably conclude that the finding is supported by the record.
14

15 *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

16    Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless

17 rebutted by clear and convincing evidence.

18    On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test

19 of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance

20 fell below an objective standard of reasonableness; and (2) counsel's defective performance caused

21 actual prejudice. On the performance prong, the issue is not what counsel might have done differently

22 but rather is whether counsel's decisions were reasonable from his perspective at the time. The court

23 starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.

24 On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's

25 unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v.*

26 *Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

27    While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review is

28 "doubly deferential" in a case governed by AEDPA. In such cases, the reviewing court must take a

-13-

1  "highly deferential" look at counsel's performance through the also "highly deferential" lens of §

2  2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

3       The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled

4  to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

5                                   ***Discussion***

6       ***First Claim:   Investigation of Alleged Partial Alibi***

7       In his first claim,[48] petitioner alleges that he was denied effective assistance of trial counsel when

8  counsel failed to pursue investigation to establish that he allegedly was out of town on the dates of some

9  of the offenses.[49]

10      The evidence from the August 2004 trial that serves as backdrop to this claim is summarized,

11  *supra*, at 2-12.

12      The victim, A.P., testified earlier at a April 2003, preliminary hearing, at age twelve.  According

13  to the transcript copy filed by petitioner,[50] A.P. testified to three incidents.  Significantly, all dates were

14  supplied by leading questions, not independently by A.P.  The first incident allegedly occurred in "July

15  of 2002."  The second allegedly occurred "also in July of 2002," "[l]ike a week – like two weeks" after

16  the first incident.  A.P. testified that Bacon then had custody "[l]ike maybe every other weekend."  She

17  _____

18      [48]Petitioner presents two numbered grounds in the amended petition containing multiple claims of ineffective
    assistance that in part overlap between the two grounds.  Typically in this district, grounds are divided into subclaims

19  with a letter designation, such as "Ground 1(a)."  In the present case, however, the least confusing manner of referring to
    the claims as pled by petitioner is to refer to them simply as "first claim," "second claim," etc.  The Court's subdivision

20  of the claims does not correlate exactly to respondents' somewhat similar breakdown of the claims.

21      [49]Respondents respond to a first claim consisting instead of a claim that counsel was ineffective for failing to
    give the investigator the discovery until the Friday before the Monday trial.  The Court is not sanguine that petitioner's

22  allegations in this regard in the federal petition constitute a claim separate and apart from the claim addressed in the text
    as opposed to factual background to the claim addressed in the text.  Nor is the Court sanguine that the Supreme Court

23  of Nevada did not address the claim as part of claims based upon the failure to investigate particular issues.  That is, it
    appears that the state supreme court, as does this Court, focused its discussion of the claims on *what* allegedly was not

24  investigated.  In all events, the Court is persuaded by respondents' argument that the state district court's rejection of the
    claim *qua* a separate claim – as *arguendo* the last reasoned state court decision on the claim – was neither contrary to

25  nor an unreasonable application of clearly established federal law.  See #18, at 7-8 (answer).  The Court is persuaded in
    this regard for substantially the reasons discussed as to the claim discussed in the text.

26

27      [50]The Court would prefer that respondents file a copy of the preliminary hearing transcript with the answer
    where claims of ineffective assistance of counsel reference alleged variances between the victim's preliminary hearing

28  testimony and later testimony.

                                     -14-

1    testified that the first two incidents occurred at the house where Bacon was staying with friends.  And

2    the third incident occurred in the car on the evening of March 1, 2003, culminating in Bacon's arrest.[51]

3          The case thereafter was submitted to a grand jury, and A.P. testified also before the grand jury.[52]

4          On the first trial day, Monday, August 2, 2004, Bacon addressed the court in proper person.  He

5    objected to the trial and maintained that defense counsel had failed to investigate the case.  Bacon stated

6    that counsel had not given the investigator, Kristine Mautner (then Stevens), the discovery until the

7    Thursday or Friday before the Monday.  He urged that investigation would establish that he was out of

8    town on certain dates and thus would show that four of the charges were false.[53]

9         Defense co-counsel stated that: (1) although the paperwork had not been filed at the time, the

10    investigator had been appointed in March of that year; (2) she had been provided the discovery and the

11    file; (3) counsel had conferred with the investigator recently; (4) counsel had made a strategic decision

12    that the investigation sought by Bacon was not warranted; and (5) counsel further had consulted with

13    Bacon as to their strategic reasons for not pursuing the investigation that he wanted.  The prosecutor

14    stated that the victim had stated some of the dates incorrectly in her preliminary hearing testimony but

15    that she had later corrected her prior testimony when the case was presented to the grand jury.[54]

16         The trial court repeatedly asked Bacon what investigation was needed.  He repeatedly gave

17    nonresponsive answers.  When Bacon then said that he did not want to say with the State present, the

18    court stated that cases were tried in that court with no secrets.  When the court again asked Bacon to

19    state – at least generally – what investigation was needed, he again gave a nonresponsive answer.[55]

20

21

22         [51]#8-3, Ex. N (electronic docketing pages 40-58), at transcript pages 6-8, 15-16, 19-25, 28-29, 33 & 43.

23         [52]It does not appear that either petitioner (who filed extensive materials) or respondents have filed a copy of a
24    transcript of A.P.'s grand jury testimony, if otherwise available.  Petitioner alleges that A.P. changed her allegations to
    state that the abuse occurred in July 2001, and he maintains that he was out of the state during July 2002.  #8, at
25    electronic docketing page 9.  It does not appear to be contested that A.P. testified that the earlier events incurred in 2001
    rather than 2002 when she testified at the grand jury.

26         [53]#18, Ex. 2a, at 4-5.

27         [54]#18, Ex. 2a, at 5-7.

28         [55]#18, Ex. 2a, at 7-10.

On state post-conviction review, it appears that petitioner presented a July 31, 2007, affidavit by Mautner.  She attested, *inter alia*, that: (1) she was not merely an investigator but was a peace officer and an expert in child sexual abuse investigation; (2) after talking initially with counsel, she "was eventually appointed [as an investigator on the case], but it was not enough time to give the case a comprehensive analysis concerning forensic interviews, evidence gathered or overlooked, procedures [and] guidelines concerning specialized types of investigations, and any other areas which may give a better understanding of the case at hand;" (3) she appeared at court and spoke with defense co-counsel "this day," with the day not being identified; (4) she still then did not have the discovery in the case but was advised by co-counsel that he had the discovery if she was interested; (5) she knew it was too late by this date "to offer any expert opinion;" and (6) she was unclear of exact dates and times.[56]

The state supreme court rejected the claim presented to that court on the following basis:

> First, appellant argues that trial counsel was ineffective for failing to investigate his claims that he was "out of town" when some of the alleged acts occurred.  Appellant fails to demonstrate that counsel was deficient or that he was prejudiced.  Beyond his general allegation, appellant failed to specify any details of his alibi defense that trial counsel should have investigated.  At trial, appellant expressed his frustration regarding counsel's lack of investigation into his alibi defense.  Trial counsel responded that he believed such an investigation would be futile, and that as a strategic matter, investigation into appellant's claims of an alibi was unnecessary.  Tactical decisions of counsel are virtually unchallengeable absent extraordinary circumstances, and appellant demonstrated no such extraordinary circumstances here.  See Howard v. State, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990) abrogated in part on other grounds by Harte v. State, 116 Nev. 1054, 1072 n.6, 13 P.3d 420, 432 n.6 (2000).  Given the victim's age, it is understandable that the victim may not perfectly recall dates of abuse.  To show that appellant was out of town on specific dates would have little probative value, indicating that counsel's decision not to investigate appellant's alibi claims was reasonable.  See LaPierre v. State, 108 Nev. 528, 531, 836 P.2d 56, 58 (noting that while a sexual assault victim must testify with some particularity regarding the charged events, a child victim need not recall the exact number of incidents or specific dates upon which the charged conduct occurred).  In addition, given the other overwhelming evidence presented against appellant, including the victim's testimony, DNA evidence, and the letter written by appellant to his family, we conclude that appellant did not demonstrate that investigation of his alleged alibi would have produced a different result at trial.  Therefore, the district court did not err in denying this claim.

#19, Ex. 9, at 2-3.

---

[56]#1, at electronic docketing pages 38-39.

1    The state supreme court's rejection of the claim was neither contrary to nor an objectively

2    unreasonable application of *Strickland*, whether on the performance or the prejudice prong of the

3    analysis.

4    The Court will return to this point a number of times herein because it bears repeating on

5    multiple particular claims that petitioner presents in this case.  Both the reasonableness of defense

6    counsel's decisions and the probability of a different outcome at trial must be assessed in the context

7    of the compelling evidence that petitioner faced at trial.  Bacon was caught by a police officer on a

8    remote road with his car windows steamed up alone in the car with his twelve-year-old stepdaughter

9    who was wearing only her bra and panties under a jacket.  When she was taken aside under the

10   protection of the officer, she acknowledged to the officer that Bacon had been touching her sexually

11   with his hands and mouth.  Bacon, with the officer standing by his car door, then fled the scene to be

12   subdued ultimately only after a high speed vehicle chase and then a pursuit on foot.  Such flight spoke

13   volumes as to Bacon's own understanding of how undeniably incriminating it  was for an adult man to

14   be caught with a twelve-year-old girl basically wearing only her underwear in a car with steamed up

15   windows in a remote area.  Evidence recovered in a sexual assault examination conducted a short time

16   thereafter demonstrated that an extensive amount of male saliva was present in the victim's vagina, with

17   a DNA profile matching Bacon and only 1 in 270,000 Caucasian males in the general population.  There

18   were no other males present in the car at the remote scene, much less males with that same specific

19   DNA profile.  The forensic criminalist testified that it was unusual for such an extensive amount to be

20   recovered in a case of oral sexual assault, and he attributed the extensive amount recovered to how

21   quickly the sexual assault examination was conducted after the incident.  The forensic evidence thus

22   presented not merely compelling, but instead essentially indisputable, corroboration of what the victim

23   told the police officer had happened nearly immediately after she was under his protection.[57]

24   In the face of such compelling evidence of guilt, it  would have been unrealistic to believe that

25   there was a reasonable probability of obtaining a different outcome at trial – on any of the charges – by

26   raising a partial alibi defense as to dates of earlier sexual offenses that the victim had testified to

27

28        [57]See text, *supra*, at 2-12.

-17-

1    previously (on leading questions) but then had corrected or changed in later testimony.  Even in cases

2    without such compelling corroborating evidence for one of the incidents, child victims frequently are

3    imprecise and/or inconsistent when attempting to remember and identify a specific date when a

4    particular incident within a series of sexual abuse incidents occurred.  Defendants in such cases often

5    believe that if they establish an alibi as to a date testified to at one point by the child, they then will have

6    conclusively established that the State's case is false in whole or in part.  However, juries remain free

7    to take into account how imprecise children can be regarding time specifics, and they frequently do so.

8    In Bacon's case, again, the last sexual abuse incident was corroborated nearly in real time by essentially

9    irrefutable evidence.  There was virtually nil chance that defense counsel could have obtained a different

10   outcome at trial – on any of the charges – by trying to establish a partial alibi for earlier dates where the

11   child victim already had indicated in later pretrial testimony that those dates were not correct.

12       The state supreme court's conclusion that petitioner could establish neither deficient

13   performance by counsel nor resulting prejudice accordingly was neither contrary to nor an unreasonable

14   application of *Strickland*.

15       Petitioner's first claim therefore does not provide a basis for federal habeas relief.[58]

16   ### Second Claim:  Demeanor and/or Character of the Victim and Her Mother

17       In his second claim, petitioner alleges that he was denied effective assistance of trial counsel

18   when counsel failed to present witnesses identified by petitioner who allegedly would have testified

19   that: (a) the victim and her mother had a reputation for being manipulative and for lying in order to get

20   their way; and (b) the victim did not appear to them to be unhappy or hurt during the time period when

21   the sexual abuse allegedly occurred.

---

23   [58]The investigator, Kristine Mautner, apparently felt that counsel should have involved her more and had her
24   pursue a "comprehensive analysis concerning forensic interviews, evidence gathered or overlooked, procedures [and]
     guidelines concerning specialized types of investigations, and any other areas which may give a better understanding of
     the case at hand."  The investigator's expectations do not establish the constitutional standard, however.  If, as the record
25   suggests, counsel analyzed the case and determined that investigation would not be needed, counsel was not required by
     the Constitution to have an investigator conduct such a generically outlined investigation.  Further, nothing in Mautner's
26   affidavit establishes that the broadly-defined investigation would have resulted in the production of evidence having a
     reasonable probability of affecting the outcome at trial.  Establishing only that counsel ultimately opted to not utilize the
27   investigator does not establish a constitutional violation in and of itself.  The investigator's subjective expectations and
     assumptions as to what should have been done by counsel in order to benefit from her stated expertise, again, does not
28   establish the constitutional standard.  See also #8, at 5 (petitioner concedes it is unclear what might have been shown).

-18-

In a counseled state post-conviction petition, counsel asserted that an investigator had interviewed: (a) "two separate witnesses that are willing to come forward and testify at an evidentiary hearing that they had been willing to testify at the time of trial that both the alleged victim and her mother had a reputation for being manipulative and for lying in an attempt to get there [sic] way;" and (b) "two individuals whose home [Bacon] and the alleged victim stayed in during some of the alleged charges [who] are willing to testify at an evidentiary hearing that they had been willing to testify at the time of [the] original trial that they had never witnesse[d] the alleged victim acting unhappy or hurt when she stayed over [at] their house for extended periods of time."[59]

It does not appear that supporting affidavits were presented from the witnesses themselves, although counsel attested that the allegations in the petition were true. The only affidavit that the Court otherwise could locate in the federal record that may have been in the state court record is a September 22, 2005, affidavit by Ricky Tallent. He attested that he is a friend of Bacon, that he "had information" regarding the charges against Bacon, that he was willing to testify for Bacon, and that neither he nor his spouse was contacted by defense counsel.[60]

The Supreme Court of Nevada rejected the claim of ineffective assistance presented to that court on the following basis:

> Second, appellant argues that trial counsel was ineffective for failing to contact witnesses identified by the defendant who would testify that the victim always appeared happy during the time of the alleged abuse, and that the victim and her mother both had a reputation for "being manipulative," and lying to get their way. Appellant fails to show that he was prejudiced. Even if such testimony was presented, appellant failed to demonstrate a reasonable probability of a different outcome given the overwhelming evidence presented against appellant, including DNA evidence and appellant's letter to his family. Therefore, the district court did not err in denying this claim.

#19, Ex. 9, at 3-4.

The state supreme court's rejection of the claim was neither contrary to nor an objectively unreasonable application of the prejudice prong of the *Strickland* analysis.

---

[59]#19, Ex. 7, at 10 & nn. 1 & 2.

[60]#1, at electronic docketing page 40.  See also *id.*, at electronic docketing page 37 (list of exhibits); #8, at electronic docketing page 15 (list of exhibits).

1    The Court reiterates.  Petitioner was caught by a police officer on a remote road with his car

2 windows steamed up alone in the car with his twelve-year-old stepdaughter who was wearing only her

3 bra and panties under a jacket.  Once under the protection of the officer, she reported Bacon's sexual

4 abuse of her with his hands and mouth.  Bacon then fled the scene in a high speed car chase, reflecting

5 his own consciousness of just how incriminating the situation in truth was.  Large amounts of what

6 essentially indisputably was petitioner's saliva then was recovered from the victim's vagina in the

7 sexual assault examination conducted a short time thereafter.[61]

8    There was not a reasonable probability that trying to attack the victim and her mother as

9 manipulative and deceitful in the face of such compelling evidence would have changed the outcome

10 at trial – whether on the March 2003 charges or the prior charges.  The victim's account as to the March

11 2003 sexual offenses was corroborated by compelling evidence, nearly real-time evidence as Bacon

12 almost was caught by the officer in the act of sexually abusing his stepdaughter.  There is not a

13 reasonable probability that attempting to attack the character of the victim and her mother would have

14 altered the outcome on the March 2003 charges.  Nor was there a reasonable probability that a challenge

15 to the character of the victim and her mother would have changed the outcome on the prior charges,

16 given that A.P's account had been so compellingly corroborated on the March 2003 charges.[62]

17    Moreover, as an experienced criminal defense lawyer would be well aware, succumbing to the

18 temptation to "attack the attacker" would run a substantial risk of alienating the jury to the point of

19 losing any chance of persuading jurors on any point.  Such a risk was a particular concern in a case

20 where the young child victim already was testifying that Bacon had expressly or impliedly threatened

21 to physically attack and kill her mother, her sister and herself if she told what had happened.  Thereafter

22 continuing in "attack mode" at trial in response to the victim telling her story, particularly with such

23 strong corroborating evidence, would not necessarily have been a prudent defense strategy.

24

25    [61]See text, *supra*, at 17, with citation to extended summary of trial evidence.

26    [62]Defense counsel did establish during cross-examination that Mary Bacon wanted full custody of her children
27 as against Jody Bacon, supporting an inference that she possibly had at least a motive to shade her own testimony and to
coach the victim's testimony.  See text, *supra*, at 6-7.  Whether there is a reasonable probability that an effort to suggest
28 fabrication on this basis would overcome the strong evidence of guilt on the March 2003 incident -- which indirectly
bolstered the child victim's testimony on the remaining incidents – is quite another matter.

-20-

1    Similarly, there was not a reasonable probability that having two lay witnesses testify essentially

2    that the child's demeanor was inconsistent with having been sexually abused would have changed the

3    outcome at trial.  Petitioner's supposition that a child who had been sexually abused necessarily would

4    appear outwardly sad to an untrained eye is unsubstantiated and speculative.  Moreover, as noted above,

5    according to A.P.'s testimony, Bacon expressly told her that he would kill her mother and sister if she

6    told anyone about the incidents.  Under that testimony, the young child had a substantial incentive

7    literally to keep up appearances rather than act in a manner that might invite an adult's inquiry.

8    The state supreme court's rejection of this claim on the record presented to the state courts

9    accordingly neither was contrary to nor an unreasonable application of clearly established federal law.

10    Petitioner's second claim therefore does not provide a basis for federal habeas relief.

11    **Third Claim:   *Motion to Suppress Arresting Officer's Testimony***

12    In his third claim, petitioner alleges that he was denied effective assistance of trial counsel when

13    counsel failed to file a motion to suppress the arresting officer's testimony on the basis that the officer

14    allegedly did not have probable cause to stop petitioner.

15    The officer's trial testimony is summarized in the text, *supra*, at 2-4.  Officer Cripe testified,

16    *inter alia*, that when he initially observed Bacon's vehicle, it was parked illegally in a travel lane in a

17    construction zone that was marked by traffic cones, with the vehicle blocking the marked travel lane.

18    Officer Cripe further testified that Bacon fled the scene in the car after the officer had taken A.P. over

19    to his patrol car to speak with her.

20    On the second trial day, prior to *voir dire*, Bacon again addressed the trial court in proper person.

21    He sought to make a record that he had requested defense counsel to file a motion to suppress the

22    officer's testimony but that counsel had not done so.  Bacon maintained:

23    THE  DEFENDANT:  That's – that's  why  I  needed  an
     investigator.  He says I was pointing east in the construction zone, right?

24    He lied.  I was pointing west, parked up against the curb, and his written
     statement even said that.  But during the preliminary hearing, he changed

25    it to give himself probable cause to pull me over.

26    #18, Ex. 2b, at 6.

27    Lead counsel's response reflected that Bacon had raised at best a matter of credibility rather than

28    a basis for a motion to suppress.  He noted further that when Bacon fled, it also changed the issue on

-21-

1   a motion to suppress.  Counsel affirmed that he had reviewed the issue and decided to not file a motion

2   to suppress, as "I just don't know what [viable objection] I could have made, Judge, under the

3   circumstances."  When Bacon suggested that counsel had not had time to file a motion to suppress,

4   counsel immediately responded: "Yeah, I did.  I had lots of time."  Counsel stated that he believed that

5   it would have been a rule violation [regarding frivolous filings] to file the motion.[63]

6       Defense co-counsel added the following:

7           MR.  BROWER: Your Honor, I do [agree that filing the motion
            would have constituted a rule violation].  When I discussed this with Mr.
8           DeNue [lead defense counsel], we discussed the initial stop.

9           Again, part of the problem is, even if the initial stop was
            problematic, Mr. Bacon did then flee, and that creates a whole new set
10          of issues.

11          According to the reports that I've read, it appeared that the
            officer's statements in some of the reports were along the same line;
12          *there wasn't as much of a problem as Mr. Bacon sees*.  He indicated that
            the vehicle was parked on the road on the side, but blocking a travel
13          lane, I believe, as well, or an exit from a different road.

14  #18, Ex. 2b, at 8-9 (emphasis added).

15      Petitioner restated his position that "[t]here was no traffic violation," asking rhetorically that "if

16  it wasn't that important, why would he lie?"[64]

17      Bacon has not identified any further specifics as a purported basis for suppressing the testimony.

18  A copy of the officer's written statement or report has not been provided to this Court.  Nor has it been

19  shown to have been part of the record before the state supreme court on the state post-conviction appeal.

20      The state supreme court rejected the claim presented to that court, on the record presented to the

21  state courts on state post-conviction review, on the following basis:

22          [A]ppellant argues that trial counsel was ineffective for failing to
            file a motion to suppress evidence stemming from the traffic stop by
23          Officer Cripe.  Appellant argues that there was no probable cause to stop
            his vehicle on the night of his arrest. Appellant failed to demonstrate that
24          counsel was deficient." [A] vehicle stop that is supported by probable
            cause to believe that the driver has committed a traffic infraction is
25          `reasonable' under the Fourth Amendment, even if a reasonable officer

26  _____

27      [63]#18, Ex. 2b, at 6-8 (stating that "even if" the stop was wrong, counsel could cross-examine as to direction).

28      [64]#18, Ex. 2b, at 9.

would not have made the stop absent some purpose unrelated to traffic enforcement." Gama v. State, 112 Nev. 833, 836, 920 P.2d 1010, 1012-13 (1996) (citing Whren v. United States, 517 U.S. 806 (1996)). Here, Officer Cripe testified that appellant's vehicle was illegally parked in a traffic lane, indicating that the stop was supported by probable cause, and that a motion to suppress would not have been meritorious. Therefore, the district court did not err in denying this claim.

#19, Ex. 9, at 4-5.

The state supreme court's rejection of the claim was neither contrary to nor an objectively unreasonable application of clearly established federal law.

Even assuming, *arguendo*, that there was a variance regarding the vehicle's position between the officer's initial written statement or report and his testimony at both the preliminary hearing and trial, such a variance would not have provided a viable basis for suppressing his testimony. Nor would repeatedly stating adamantly that the officer was lying and that there was no basis for a traffic stop have resulted in suppression of the officer's testimony. No good faith basis for a motion to suppress was presented by petitioner to the state courts in support of the claim on state post-conviction review. Petitioner failed to demonstrate either that trial counsel rendered deficient performance by declining to file a motion to suppress or that there was a reasonable probability of success on such a motion.[65]

Petitioner's third claim therefore does not provide a basis for federal habeas relief.

**Fourth Claim:  Chain of Custody**

In his fourth claim, petitioner alleges that he was denied effective assistance of trial counsel because "[p]etitioner . . .  wished to object to the chain of custody regarding some of the evidence ([August 3, 2004, trial transcript, at] p.21) . . . [but] [i]n fact counsel agreed to stipulate to chain of custody." #8, at electronic docketing page 4.

The cited page of the trial transcript in pertinent part reflects only the following, shortly before the jury venire was brought in for *voir dire*.

_____

[65]Petitioner urges in the petition that counsel stated that there were "some issues regarding the traffic stop" and that he "conceded [an] issue that may have been [sic] legitimate Constitutional concerns."  #8, at electronic docketing page 4; see also #19, Ex. 7, at 10 (same allegations in state petition).  Nothing in the colloquy summarized in the text supports a statement that counsel acknowledged having failed to raise a potentially meritorious constitutional issue.

Moreover, merely because petitioner repeatedly requested that defense counsel file a motion to suppress does not establish that he was denied constitutionally effective assistance of counsel when counsel declined to do so.

-23-

1    The State indicated that counsel had agreed to stipulate to the chain of custody as to the clothes

2    recovered from the car and impounded by the crime scene analyst and that the evidence was in the same

3    or substantially the same condition as when it was recovered.[66]

4          Defense co-counsel then stated:

5              MR. BROWER: Again, Mr. Bacon's objection to the items
             themselves, which you already ruled on [*i.e.*, in the discussion of the
6            motion to suppress that petitioner wanted counsel to file, discussed
             *supra*]. He's got – he's got his own issues with the suppression and with
7            those issues, but we have agreed to stipulate.

8    #18, Ex. 2b, at 21.

9          The evidence in question was a T-shirt and tank top that the crime scene analyst recovered from

10   the passenger side of Bacon's vehicle.  The evidence was admitted during the investigating detective's

11   testimony.  He testified that the clothing was the clothing that he saw on the passenger's side of the

12   vehicle on the evening in question and that it was in the same or substantially the same condition as

13   when he saw it then.  The evidence was admitted without objection, such that the crime scene analyst

14   was not also called to testify as well as to chain of custody particulars.  It was stipulated that crime scene

15   analyst Russ Pulliam, at the detective's direction, had recovered and impounded the evidence.[67]

16         A.P. identified the clothing during her testimony as clothing that she had been wearing that

17   evening, before Bacon made her disrobe.[68]

18         The state supreme court rejected the claim presented to that court, on the record presented to the

19   state courts on state post-conviction review, on the following basis:

20

21             [A]ppellant argues that trial counsel was ineffective for
             stipulating to the chain of custody of some of the victim's clothing
22           recovered from appellant's car. Appellant failed to specify any defects
             regarding the chain of custody. Therefore, given appellant's failure to
23           support this claim with factual assertions, the district court did not err in
             denying this claim.

24   #19, Ex. 9, at 5.

25   _____

26   [66]#18, Ex. 2b, at 21.

27   [67]#18, Ex. 2f, at 236-44.

28   [68]#18, Ex. 2p, at 162-63.

1  The state supreme court's rejection of this baseless claim was neither contrary to nor an

2  objectively unreasonable application of clearly established federal law.

3  Petitioner has not identified any viable basis for an objection to the admission of the child's

4  clothes based on defective chain of custody. His mistaken belief that there was a basis for suppressing

5  the arresting officer's testimony, discussed *supra*, provides no viable basis for objecting to admission

6  of the clothing into evidence. If counsel had not stipulated to the chain of custody on the evidence, the

7  State simply could have called the crime scene analyst to testify as to chain of custody. Petitioner has

8  identified no defect in the chain of custody that would have remained even if the analyst had been called

9  absent the stipulation. Moreover, the detective's testimony quite easily could have supported admission

10  of the evidence even without the crime scene analyst's testimony or the stipulation in lieu thereof.

11  Chain of custody is not as rigorous of a requirement as petitioner perhaps believes. It is not necessary

12  to establish every step in the chain of custody for the evidence to be admitted. Any gaps or doubts as

13  to the chain of custody goes only to the weight of the evidence, not its admissibility. *See, e.g., Cortes

14  v. State*, 260 P.3d 184, 193 (Nev. 2011); *Hughes v. State*, 116 Nev. 975, 981, 12 P.3d 948, 952 (2000).

15  Furthermore, petitioner's conviction hardly turned upon either this evidence or in how the

16  evidence was handled between the time that the detective saw the clothing in the car and then later at

17  trial. No inculpatory forensic evidence – such as serological or DNA evidence – was presented at trial

18  that had been obtained from the child's T-shirt or tank top.[69] The compelling forensic evidence at trial

19  instead was evidence essentially irrefutably establishing that Bacon's saliva was recovered from the

20  twelve-year-old victim's vagina during the sexual assault examination. All that the clothing did was

21  corroborate the victim's testimony on the collateral point that Bacon had made her disrobe as well as

22  the officer's testimony that she was wearing a bra with no shirt under a jacket when he stopped the

23  vehicle. The case hardly turned on either the discovery of the shirts on the passenger side of the vehicle

24  and/or the quality of the handling of the clothing after the police impounded the clothing.

25  Petitioner's claim in the final analysis instead is based on the erroneous belief – reflected

26  repeatedly in the petition – that if he told defense counsel to do something and counsel did not do so,

27

28  [69]See #18, Ex. 2m, at 36-37; *id.*, Ex. 2n, at 65.

-25-

1    he has established ineffective assistance of counsel.  That is not the law.  Defense counsel is not

2    required to raise every objection and pursue every avenue that the lay defendant believes should be

3    raised or pursued.

4           Experienced defense counsel instead would realize that raising meritless objections

5    accomplishes nothing and actually may hurt the defense.  Raising meritless objections tends to impair

6    counsel's credibility with the court, making it more difficult to argue persuasively to the court when

7    counsel actually has a potentially meritorious objection.  Raising meritless objections in front of the jury

8    also has a tendency to highlight the evidence as being very important and prejudicial to the defense,

9    given the effort being expended to fight its admission.  Vigorously fighting the admission of evidence

10   based upon a meritless objection that clearly will not be sustained potentially may give the evidence

11   a perceived importance in the mind of jurors that it might not have been given otherwise.

12          The state supreme court's rejection of this claim clearly was neither contrary to nor an

13   objectively unreasonable application of *Strickland*.  Nothing in the record on state post-conviction

14   review reflected that defense counsel rendered deficient performance in stipulating to the chain of

15   custody on the clothing.  Nor is there anything in the record on state post-conviction review reflecting

16   that there was a reasonable probability that the outcome would have been different if counsel had not

17   done so, regarding either the admission of the evidence itself or the outcome of the trial.

18          Petitioner's fourth claim therefore does not provide a basis for federal habeas relief.

19      ***Fifth Claim: Opening Statement***

20          In his fifth claim, petitioner alleges that he was denied effective assistance of trial counsel

21   because counsel failed to give an adequate opening statement.

22          Lead defense counsel gave the following opening statement:

23
24                 Ladies and gentlemen of the jury.  You've had the indictment
              read to you, and you've heard Ms. Brown [the prosecutor], and you'll get
              jury instructions at the end of trial.
25
26                 There's nothing Ms. Brown – she would concede this if we asked
              her: Nothing she said is evidence.  During an opening statement, the
              State tells you what they intend to prove.
27
28                 And I sort of liken an opening statement to this.  This is all I am
              going to say for my opening: You have just been given certain pieces of

-26-

1      the puzzle that the State is going to ask you to put together in the jury
2      room.  We're just going to ask you to make sure that every single piece
     fits.  Make sure that they've been held to their standard of proof.

3           And if they don't fit on each and every piece, we are going to ask
4      you [to] come back and find a not guilty verdict on any that you find
     don't fit.

5           Thank you.

6 #18, Ex. 2f, at 210.

7     After the close of the evidence, defense counsel hearkened back to his puzzle analogy from the

8 opening statement in arguing that the pieces of the State's puzzle did not all fit.  He maintained that

9 every piece must fit on every single count.[70]

10     Petitioner alleges that counsel's opening statement constituted ineffective assistance of counsel

11 because counsel did not refer to any evidence, did not mention by name petitioner or any of the

12 witnesses who would testify for or against him, did not suggest any potential defense arguments, and

13 did not even indicate that there was a small possibility that petitioner might be innocent.[71]

14     The state supreme court rejected the claim presented to that court on the following basis:

16      [A]ppellant argues that trial counsel was ineffective for
delivering an inadequate opening statement.  Appellant fails to show that
counsel was deficient, or that he was prejudiced.  Appellant argues that
counsel's opening statement was ineffective because it comprised only
one page of trial transcript, did not specifically refer to any evidence, and
simply requested that the jury ensure that they held the State to its burden
of proof.   Appellant has not specified what additional pieces of
information counsel should have included in his opening, nor has he
shown that the result of trial would have been any different if counsel
had delivered a longer opening statement. In addition, counsel's decision
to deliver a short opening statement was strategic in nature, and
appellant did not demonstrate any "extraordinary circumstances"
necessitating judicial review of this decision. . . . . Therefore, the district
court did not err in denying this claim.

23 #19, Ex. 9, at 6-7.

24     The state supreme court's rejection of this claim was neither contrary to nor an objectively

25 unreasonable application of clearly established federal law.

27   [70]#18, Ex. 2r, at 245 & 248.

28   [71]#8, at electronic docketing page 4.

1    Defense counsel's opening statement reflects a fairly common strategic approach often
2    employed by experienced criminal defense counsel in a given case, particularly in the face of anticipated
3    strong evidence by the prosecution.  Here, as noted previously herein, the State had compelling evidence
4    of guilt in particular as to the child sex abuse offenses occurring on or about March 1, 2003.  Bacon
5    nearly was caught by a police officer actually in the act of sexually abusing his twelve-year-old
6    stepdaughter, and the forensic evidence essentially irrefutably confirmed that he had done so.  Defense
7    counsel emphasized that what the prosecutor had said in opening argument was not evidence; that the
8    State had the burden of proof; and, via the puzzle analogy, that the State must prove every element of
9    every offense to sustain a conviction on the offense.  That, again, is a fairly common opening statement
10   stratagem by a defense lawyer – not committing the defense, which does not have the burden of proof,
11   to affirmatively establishing any fact but instead asking the jury both to keep an open mind and to hold
12   the State to its burden of proof.

13   Moreover, as the Supreme Court of Nevada noted, petitioner cannot establish a reasonable
14   probability that a different, and as yet unspecified, opening statement would have changed the outcome
15   at trial.

16   Petitioner's fifth claim therefore does not provide a basis for federal habeas relief.

17   **Sixth Claim: Cross-Examination of the Arresting Officer**

18   In his sixth claim, petitioner alleges that he was denied effective assistance because trial counsel
19   failed to cross-examine the arresting officer regarding "potential inaccuracies in his statement."

20   As discussed above regarding petitioner's second claim, Bacon sought to make a record on the
21   first trial day that he had requested defense counsel to file a motion to suppress but counsel had not done
22   so.  During the discussion that followed, Bacon suggested that the arresting officer had said in his
23   statement that Bacon's car was pointing west, up against the curb, but the officer testified later that the
24   vehicle was pointed east in a construction zone.[72]

25   Lead defense counsel responded initially – as to the motion to suppress – *inter alia* that "even
26   if the initial stop was wrong . . . and I can cross-examine him on whether the car was pointed east or

27

28   [72]#18, Ex. 2b, at 5-6.

1  west . . . [t]hese are issues that go to his credibility, not a motion to suppress."  Co-counsel, however,

2  thereafter indicated during the same discussion that there in fact was no material discrepancy as

3  described by Bacon:

5        According to the reports that I've read, it appeared that the
        officer's statements in some of the reports were along the same line [as
6        the officer's testimony]; *there wasn't as much of a problem as Mr.
        Bacon sees. He indicated that the vehicle was parked on the road on the
7        side, but blocking a travel lane, I believe, as well, or an exit from a
        different road.*

8  #18, Ex. 2b, at 8-9 (emphasis added).

9        When defense counsel cross-examined Officer Cripe, counsel did not ask any questions

10 regarding any – purported – inconsistencies between the officer's written statement and his testimony

11 at the preliminary hearing and on direct.[73]

12       Officer Cripe was recalled later in the trial.  Prior to his testimony on recall, petitioner again

13 addressed the court in proper person.  He sought to register his objection to defense counsel's earlier

14 cross-examination:

16       THE DEFENDANT: Yesterday when Officer Cripe got up on the
        stand, he made a statement and that's why I talked to you before about,
        you know, him lying and giving himself probable cause to pull me over.

18       Nothing was addressed on that, and I would like to object to it.

19                     . . . . .

20       THE DEFENDANT: [Following colloquy with the trial court.]
        It wasn't addressed.  Nobody addressed it, Your Honor.  Just – I feel it
21       needs to be brought up and him cross-examined, you know, to bring it
        up that he did lie.  And it wasn't.

22 #18, Ex. 2m, at 10-11.

23       Defense counsel responded that he believed that he brought out the points that he needed for

24 appeal, including that the officer did not pull up behind the car immediately.  Counsel indicated that

25 petitioner perhaps was "laboring under the impression . . . that the jury decides probable-cause issues"

26 and wanted defense counsel to somehow force the officer to admit that he allegedly had lied.  Petitioner

[73]#18, Ex. 2f, at 226-29.

-29-

1  responded that "I just want it brought up, you know, him – from what he said in the preliminary hearing

2  and what he wrote in his statement, and then what he said up there is totally different."[74]

3       Petitioner did not identify specific alleged inconsistent statements during the colloquy with the

4  court and counsel at any time before the discussion on the point concluded. Thereafter, immediately

5  prior to the jury being brought in, Bacon again addressed the court in proper person. He stated to the

6  trial court, in an exchange including profanity, that, *inter alia,* "I feel now I won't be able to hold, you

7  know, hold myself back, you know." The trial court indicated to Bacon in clear terms that he would

8  be restrained and his mouth duct-taped if he could not do so. The court thereafter gave petitioner

9  another opportunity to state his concerns before the jury was brought in. Petitioner referred, *inter alia*,

10  to a "sheet of all the inconsistencies from Cripe's statement and the victim's statement" that he had

11  given to defense counsel. However, nothing in the passage in the trial transcript reflects what those

12  alleged inconsistencies were.[75]

13       On state post-conviction review, petitioner – who was represented by counsel – relied upon only

14  the portions of the trial transcript summarized immediately above in support of the claim of ineffective

15  assistance of trial counsel. Petitioner urged that trial counsel – in the initial response by lead counsel

16  referred to in the text – had admitted that there were inconsistencies in Officer Cripe's written statement

17  but had not pursued them. Petitioner – who again was represented by counsel – did not refer to Officer

18  Cripe's actual statement, and he did not identify on state post-conviction review the alleged

19  inconsistencies between the statement and his later testimony.[76]

20       The state supreme court rejected the claim presented to that court on the following basis:

21            [A]ppellant argues that trial counsel was ineffective for failing to
             cross examine Officer Cripe regarding the circumstances of the traffic
22            stop, and "potential inaccuracies" in his testimony. Appellant fails to
             specify what additional questions counsel should have asked, or what the
23            "potential inaccuracies" in Officer Cripe's testimony were. In addition,
             even if counsel had established several technical inaccuracies in Officer
24            Cripe's description of the initial traffic stop, given the other

25

26  [74]#18, Ex. 2m, at 11-12.

27  [75]#18, Ex. 2m, at 13-17.

28  [76]#19, Ex. 7, at 11-12.

1
2

> overwhelming evidence presented against appellant, appellant did not demonstrate that the result of the trial would be any different. Therefore, the district court did not err in denying this claim.

3    #19, Ex. 9, at 5.

4    The state supreme court's rejection of this claim on the record presented to that court was neither

5    contrary to nor an objectively unreasonable application of clearly established federal law.

6    Petitioner has the burden of both production and persuasion on both state and federal post-

7    conviction review.  Petitioner did not present the state courts – whether at trial or on post-conviction

8    review – with the alleged actual inconsistencies in the prior statement.  He instead relied upon a

9    supposed concession in a statement by lead counsel and upon his own repeated conclusory allegation

10   that there were "potential" inconsistencies.

11   Lead defense counsel's initial statement – referenced *supra* – did not establish that there were

12   in fact material inconsistencies between Officer Cripe's statement and his later testimony.  Counsel

13   instead quite clearly was indicating that any such inconsistencies were fodder for cross-examination

14   rather than a motion to suppress, which was the issue then being discussed.  Co-counsel clearly

15   indicated later in the same discussion that the officer's statement instead was in line with his later

16   testimony and "there wasn't as much of a problem as Mr. Bacon sees."  In context, nothing in what

17   defense counsel said would carry petitioner's burden of proof of establishing more probably than not

18   that material inconsistencies in the officer's written statement were not explored during cross-

19   examination.

20   Petitioner's own repeated self-serving and conclusory statements that there were such

21   "potential" inconsistencies quite clearly does not establish that there were.

22   On the record presented to the state courts – in which petitioner did not directly establish that

23   there were in fact material inconsistencies between the actual written statement and the officer's later

24   testimony – the state supreme court's rejection of this unsubstantiated claim quite clearly was neither

25   contrary to nor an objectively unreasonable application of clearly established federal law.

26   Petitioner's sixth claim therefore does not provide a basis for federal habeas relief.

27   / / / /

28   / / / /

***Seventh Claim: Cross-Examination Regarding the Victim's Inconsistent Statements***

In his seventh claim, petitioner alleges that he was denied effective assistance because trial counsel failed to cross-examine the child victim and police officers regarding alleged inconsistencies between her prior accounts and her testimony.  Petitioner refers to the change in the child victim's testimony between the preliminary hearing and the grand jury regarding the year in which the earlier offenses occurred, which is discussed, *supra*, regarding petitioner's first claim.  He further alleges conclusorily that "[t]he differences involved the level of alleged sexual contact between Petitioner and her at the various alleged sexual assault occurrences."[77]  Petitioner additionally alleges, again conclusorily, that "[t]rial counsel failed to cross-examine any officer about inconsistencies in the various police reports."[78]

The victim's trial testimony is summarized, *supra*, at 8-11.

During cross-examination, defense counsel elicited an acknowledgment from the victim that she had testified under oath in the past in the case and that it was true that her story had changed over time.[79]

The state supreme court rejected the claim presented to that court on the following basis:

> [A]ppellant argues that trial counsel was ineffective for failing to cross examine the victim regarding changes in her testimony.  Appellant fails to demonstrate that counsel was deficient, or that he was prejudiced.  On cross examination, counsel asked the victim if her story had changed over time, and the victim acknowledged that it had.  Counsel did not pursue this line of questioning further.  Given the age of the victim, it was an understandable strategic decision of counsel to not cross examine the victim more aggressively.  See Howard, 106 Nev. at 722, 800 P.2d at 180 (noting that strategic decisions of counsel are virtually unchallengeable absent extraordinary circumstances).  In addition, as the victim had already acknowledged that her story had changed from when she first spoke to the police, appellant did not demonstrate that the result of the trial would have changed if counsel had cross examined the victim more aggressively.  Therefore, the district court did not error in denying this claim.[FN1]
>
> [FN1] To the extent appellant also argues that trial counsel should have cross examined various police

---

[77]#8, at electronic docketing page 9.

[78]#8, at electronic docketing page 5.

[79]#18, Ex. 2p, at 170-71.

1

2

3

> officers regarding the inconsistencies in the victim's statements to the police, appellant has failed to identify any specific factual inconsistencies that should have been the subject of questioning. Accordingly, the district court did not error in denying this claim.

4   #19, Ex. 9, at 5-6.

5        The state supreme court's rejection of this claim on the showing made in the state courts was

6   neither contrary to nor an unreasonable application of clearly established federal law.

7        The Court notes again that petitioner was caught by a police officer on a remote road with his

8   car windows steamed up alone in the car with his twelve-year-old stepdaughter who was wearing only

9   her bra and panties under a jacket.  Once in the protection of the officer, she reported Bacon's sexual

10  abuse of her with his hands and mouth.  Bacon then fled the scene in a high speed car chase, reflecting

11  his own consciousness of how incriminating the situation was.  Large amounts of what essentially

12  indisputably was petitioner's saliva then was recovered from the victim's vagina in the sexual assault

13  examination conducted a short time thereafter.[80]

14        The consistent theme that ran through the child victim's testimony regarding the foregoing

15  March 2003 incident and prior incidents was the much larger Bacon using threats and bullying the child

16  to get her to submit to his demands for sexual gratification.[81]

17        Aggressively cross-examining the child regarding each and every alleged prior inconsistency

18  – after her acknowledgment that her story had changed over time – against the backdrop of such alleged

19  aggressive bullying would not necessarily have been the most advisable of trial strategies.  Nor is there

20  a reasonable probability that taking a more aggressive approach with the victim on the stand – *e.g.,*

21  cross-examining her as to whether she had said earlier that Bacon had sexually abused the child with

22  his mouth or instead with only his hands on a particular date – would have changed the outcome at trial.

23  Indeed, the more reasonable probability would have been that a more aggressive cross-examination

24  would have alienated rather than persuaded a jury.  As noted on a prior claim, juries remain free to take

25  into account how imprecise children can be on time specifics, and they frequently do so.

26  _____

27        [80]See text, *supra,* at 17, with citation to extended summary of trial evidence.

28        [81]See text, *supra,* at 8-11.

1    Petitioner's seventh claim therefore does not provide a basis for federal habeas relief on the

2    showing made in the state courts.[82]

3    ***Eighth Claim: Closing Argument***

4    In his eighth claim, petitioner alleges that he was denied effective assistance because trial

5    counsel argued that there was no evidence of actual penetration or violence whereas the State

6    purportedly had not alleged penetration or violence.  Petitioner urges that counsel therefore addressed

7    elements of charges with which he was not even charged.

8    The state supreme court rejected the claim presented to that court on the following basis:

9        [A]ppellant argues that trial counsel was ineffective for stating
     in closing argument that there was no evidence of violence or actual
10   penetration by appellant. Appellant argues that this was inappropriate
     because the State had not alleged actual penetration or violence.
11   Appellant fails to show that counsel was deficient, or that he was
     prejudiced. During closing argument, counsel stated that the examining
12   doctor found

13       no bruises ..., no bleeding, she found no evidence of
     trauma to the vaginal area, no evidence of redness, no
14   cuts to the hymen, no evidence of penetration.

15   The State charged appellant with three counts of sexual assault of a
     minor under the age of fourteen.  Sexual assault requires proof of some
16   type of penetration, either through digital penetration, cunnilingus, or
     sexual intercourse. <u>See</u> NRS 200.364; NRS 200.366. Counsel's
17   references to bleeding, bruising, and redness appear to be interconnected
     with his argument attacking a finding of penetration. Therefore, counsel
18   was not ineffective for arguing that there was no evidence of penetration.
     In addition, appellant has not demonstrated that omission of this
19   statement would have had any reasonable probability of altering the
     jury's verdict.  Accordingly, the district court did not err in denying this
20   claim.

21   #19, Ex. 9, at 7.

22   The state supreme court's rejection of this claim was neither contrary to nor an objectively

23   unreasonable application of clearly established federal law.

24   _____

25   [82]Petitioner refers conclusorily to alleged inconsistencies in "various police reports."  The record does not
     reflect that changes in the victim's accounts necessarily would have been contained in "various police reports."  A
26   number of additional charges were based on what the victim told the prosecutor, not necessarily the police as such, the
     day prior to the preliminary hearing.  See #8-3, Ex. N (electronic docketing pages 40-58), at transcript pages 4-5.
27   Petitioner, again, has the burden of both production and proof on both state and federal post-conviction review.  His
     conclusory presentation in the state courts – where he was represented by counsel on state post-conviction review –
28   failed to demonstrate a denial of effective assistance of counsel under the Sixth Amendment in this regard.

-34-

1    Petitioner's claim is completely baseless.  As explained by the state supreme court, penetration

2   in fact was an element of the charge brought against petitioner of sexual assault of a minor under the

3   age of fourteen.  The jury was so instructed at Bacon's trial.[83]  Penetration is not required on a lewdness

4   charge, but it is required on a sexual assault charge.  Bacon was charged with both.  Petitioner otherwise

5   does not identify where in the closing argument defense counsel argued that the State had failed to

6   prove violence.[84]  The point that there was no trauma to the vaginal area pertains to the argument that

7   there was no evidence of penetration.[85]

8    Petitioner's eighth claim provides no basis for federal habeas relief.

9   ***Ninth Claim: Cronic Claim***

10    In his ninth claim, petitioner alleges that defense counsel failed to subject the State's case to

11   meaningful adversarial testing – based upon the preceding eight claims – such that he allegedly is not

12   required to demonstrate resulting prejudice.  He repeats this contention throughout his petition, alleging

13   that counsel failed to subject the State's case to meaningful adversarial testing in each instance where

14   counsel failed to follow petitioner's directives as to how to defend the case.

15    The state supreme court rejected the claim presented to that court on the following grounds:

16    Finally, appellant argues that all of the actions of counsel
described above indicate that trial counsel was ineffective for failing to

17   subject the case against appellant to meaningful adversarial testing.  As
established by the United States Supreme Court in United States v.

18   Cronic,

19    The right to the effective assistance of counsel is thus the
right of the accused to require the prosecution's case to

20   survive the crucible of meaningful adversarial testing.
When a true adversarial criminal trial has been conducted

21   even if defense counsel may have made demonstrable
errors - the kind of testing envisioned by the Sixth

22   Amendment has occurred.

23   _____

24   [83]See #18, Ex. 2L, Instruction Nos. 7 & 8.

25   [84]See #18, Ex. 2r, at 255-51 (defense closing argument).

26   [85]The jury in any event was instructed that "[t]here is no consent where the victim is induced to submit to
sexual acts through fear of death or serious bodily injury." #18, Ex. 2L, Instruction No. 11; see also *id.*, Instruction Nos.

27   9-10.  It would not constitute ineffective assistance for defense counsel to point out that there was no evidence of the
child being violently sexually assaulted, even if a sexual assault potentially also could be committed through other

28   means without such a violent assault.

-35-

1    466 U.S. 648, 656 (1984) (internal footnote omitted).  Appellant fails to
2    demonstrate that trial counsel failed to subject the State's case to
     meaningful adversarial testing. Trial counsel asked multiple follow up
3    questions to the jury following voir dire by the district court judge, and
     exercised all of the defense's peremptory challenges. Trial counsel cross-
4    examined each witness, and made multiple objections during the State's
     examination of witnesses and during its closing argument. Trial counsel
5    moved for a directed verdict after the victim was unable to identify the
     appellant on the day of trial, due to changes in his appearance. Given
6    each of these actions, we conclude that counsel appropriately tested the
     State's case. Therefore, the district court did not err in denying this claim.

7    #19, Ex. 9, at 8-9.

8         The state supreme court's rejection of this claim was neither contrary to nor an unreasonable

9    application of *Cronic* or other clearly established federal law.

10        The *Cronic* presumption of prejudice arises in far more egregious situations such as where

11   counsel concedes the defendant's guilt or literally is asleep during the trial.  *See, e.g., United States v.*

12   *Swanson*, 943 F.2d 1070, 1075 (9th Cir.1991); *Javor v. United States*, 724 F.2d 831 (9th Cir.1984).

13   Here, petitioner was represented by two attorneys at trial.  Merely because counsel did not pursue

14   avenues of defense or other steps that the lay petitioner thought were advisable does not establish that

15   counsel failed to subject the State's case to meaningful adversarial testing.  In many contexts in a

16   criminal trial, defense counsel is not ineffective simply because counsel does not defend the case as the

17   lay defendant directs counsel to defend the case.  Following review of the entire trial transcript, this

18   Court fully concurs with the state supreme court's conclusions that counsel meaningfully tested the

19   State's case and that the *Cronic* presumption of prejudice is inapplicable.

20        Petitioner's ninth claim therefore does not provide a basis for federal habeas relief.

21   ***Additional Matters***

22        The Court will strike the addendum (#29) filed subsequent to the reply.  Petitioner may not

23   present further submissions after the reply without leave of court first obtained.  The addendum in any

24   event constitutes little more than an extended rant by petitioner about the state and federal courts.

25   Petitioner further should note that if papers are filed in this Court in which a non-lawyer inmate refers

26   to himself as "counsel," the Court will refer the matter to the appropriate authorities for potential

27   criminal prosecution for unauthorized practice of law.  Inmates may assist other inmates, but they may

28   not refer to themselves as counsel.  The addendum, in all events, will be stricken.

-36-

1    Special Order 108 states in pertinent part that "[i]f the involvement of a minor child must be

2  mentioned, only the initials of that child should be used."  The Court understands that the minor child

3  in this case would not remain a child in the intervening years.  However, the privacy interests of a

4  then-vulnerable child do not stop as to incidents in which they were involved as a child merely because

5  they since have become an adult.  Nor does the potential for harm from disclosure end after the child

6  becomes an adult.  Indeed, it is not difficult to conceive of scenarios in which such public disclosure

7  during the former child's adult years may be quite harmful.  For all papers filed hereafter, the parties

8  shall comply with Special Order 108 as to all individuals who were minors at the operative time, using

9  only their initials.

10    ***Consideration of Possible Issuance of a Certificate of Appealability***

11    Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or deny a

12  certificate of appealability (COA) when it enters a final order adverse to petitioner.

13    As to the claims rejected by on the merits, under 28 U.S.C. § 2253(c), a petitioner must make

14  a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of

15  appealability.  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104

16  (9th Cir. 1999).  To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would

17  find the district court's assessment of the constitutional claim debatable or wrong."  *Slack*, 529 U.S. at

18  484.

19    The Court will deny a certificate of appealability as to all nine of the claims of ineffective

20  assistance of trial counsel presented by petitioner.[86]

21    The Court summarizes the trial evidence that serves as backdrop to the ineffective assistance

22  claims in the text, *supra*, at 2-12.

23    The evidence at trial included compelling evidence following upon petitioner nearly being

24  caught by the arresting officer in the act of sexually abusing his twelve-year-old stepdaughter in the last

25  of the charged incidents.

26  _____

27    [86]Respondents break the same allegations down into eleven claims.  However, the Court addresses: (a) both the
    first and second claims identified by respondents under the first claim discussed herein; and (b) both the third and ninth

28  claims identified by respondents under the second claim discussed herein.

-37-

1      Jody Bacon was caught by a police officer in March 2003 on a remote road with his car windows

2  steamed up alone in the car with his twelve-year-old stepdaughter who was wearing only her bra and

3  panties under a jacket.  When she was taken aside under the protection of the officer, she acknowledged

4  to the officer that Bacon had been touching her sexually with his hands and mouth.  Bacon, with the

5  officer standing by his car door, then fled the scene to be subdued ultimately only after a high speed

6  vehicle chase and then a pursuit on foot.  Such flight spoke volumes as to Bacon's own understanding

7  of how incriminating it  was for an adult man to be caught with a twelve-year old girl basically wearing

8  only her underwear in a car with steamed up windows in a remote area.  Evidence recovered in a sexual

9  assault examination conducted a short time thereafter demonstrated that an extensive amount of male

10  saliva was present in the victim's vagina, with a DNA profile matching Bacon and only 1 in 270,000

11  Caucasian males in the general population.  There were no other males present in the car at the remote

12  scene, much less males with that same specific DNA profile.  The forensic criminalist testified that it

13  was unusual for such an extensive amount to be recovered in a case of oral sexual assault, and he

14  attributed the extensive amount recovered to how quickly the sexual assault examination was conducted

15  after the incident.  The forensic evidence thus presented not merely compelling, but instead essentially

16  indisputable, corroboration of what the victim told the police officer had happened nearly immediately

17  after she was under his protection.[87]

18      The state supreme court's rejection of petitioner's claims of ineffective assistance of trial

19  counsel against the backdrop of such strong corroborative evidence was neither contrary to nor an

20  objectively unreasonable application of clearly established federal law as determined by the United

21  States Supreme Court.  To be sure, many of petitioner's allegations of ineffective assistance pertain to

22  earlier offenses not subject to the – at least direct – corroboration presented in the evidence from the

23  March 2003 incident.  However, for example, there was not a reasonable probability that presenting

24  alleged partial alibi evidence for July 2002 would have changed the outcome at trial given that the child

25  victim had corrected the dates to July 2001 in her grand jury testimony well before trial.  She had

26  testified to July 2002 at the preliminary hearing in response to leading questions in which the prosecutor

27

28        [87]See text, *supra*, at 2-12.

-38-

1  – not the victim – had supplied the year.  However, when the case was brought before a grand jury she

2  testified that the incidents instead occurred in July 2001.  The state supreme court held that trial counsel

3  did not provide deficient performance by failing to pursue such an ineffectual alibi defense and that

4  there was not a reasonable probability of such a defense changing the outcome at trial, on any of the

5  charges.  These holdings were neither contrary to nor an objectively unreasonable application of clearly

6  established federal law.  Juries of course remain free to take into account how inaccurate children can

7  be regarding time specifics, and they frequently do so.  **See text,** *supra*, **at 14-18.**

8         Petitioner's remaining claims similarly reflect only a lay perception of the likely impact of the

9  strategy that he wanted counsel to pursue and/or simply were unsubstantiated on the record presented

10  to the state supreme court when it rejected the claim on the merits.  **See text,** *supra*, **at 18-36.**

11         Jurists of reason would not find this Court's rejection of the claims on AEDPA review to be

12  debatable or wrong.  A certificate of appealability therefore will be denied as to all claims.

13         IT THEREFORE IS ORDERED that the petition, as amended, shall be DENIED on the merits

14  and that this action shall be DISMISSED with prejudice.

15         IT FURTHER IS ORDERED that a certificate of appealability is DENIED.  **See text,** *supra*, **at**

16  **37-39.**

17         IT FURTHER IS ORDERED that petitioner's addendum (#29) is STRICKEN.

18         IT FURTHER IS ORDERED that, for all papers filed hereafter in this action, the parties shall

19  refer to individuals who then were minors at the relevant time only by their initials.

20         The Clerk shall enter final judgment accordingly in favor of respondents and against petitioner,

21  dismissing this action with prejudice.[88]

22         DATED this 24th day of February, 2014.

23

24                                                          _____

25                                                          LARRY R. HICKS
                                                           UNITED STATES DISTRICT JUDGE

26

27         [88]Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record
   presented to the state court that adjudicated the merits of the claims.  *See Pinholster,* 131 S.Ct. at 1398-1401.  Petitioner

28  otherwise has not presented a viable basis for an evidentiary hearing in this matter.